Fred HARTNETT, Appellant (Plaintiff),

v.

James C. JONES; Cleda V. Whitlock and James Lee Whitlock, co-executors of the Estate of Oscar J. Whitlock, deceased, Appellees (Defendants).

No. 5284.

Supreme Court of Wyoming.

June 19, 1981.

W. W. Reeves of Vlastos & Reeves, P. C., Casper, for appellant (plaintiff).

E. L. McCrary, Casper, for appellees (defendants).

Before McCLINTOCK,* RAPER,** THOMAS and ROONEY, JJ.

THOMAS, Justice.

The question raised in this appeal is whether a preemptive right to purchase included in a contract concerning co-ownership of land which provides that the contract is binding upon "heirs, personal representatives and assigns" is void because it violates the rule against perpetuities. The district court held that it was void, but we will hold that under the circumstances of this case the contract did not violate the rule against perpetuities. Furthermore, it did not constitute an unreasonable restraint upon alienation. We will affirm the judgment of the district court, however, because the appellant waited too long to assert his claim, and under the facts of this record the appellant's claim is barred by the doctrine of laches.

The events leading up to this controversy had their inception prior to August 20, 1959, when Oscar J. Whitlock purchased a tract of land under a contract for deed from William E. Pratt and Gertrude Arlene Pratt, husband and wife. On August 20, 1959, by a handwritten document entitled "Sale and Purchase Agreement," Oscar J. Whitlock agreed to sell and James C. Jones and Fred Hartnett agreed to buy a 40 percent undivided interest in the tract of land that Whitlock was purchasing from the Pratts. That document included among its provisions the following language:

"The buyers shall not sell and assign their right, title and interest in, to and under this contract and to the above described property unless and until he [sic] first offers to sell same to seller and the latter refuses within 15 days to pay the buyers'

asking price, whereupon the buyers may then sell to any third party for a price equal to or in excess of that for which they have offered to sell to seller herein; but if they decreased their price they must first offer to sell to seller herein at the decreased price and the seller herein in each such instance shall have 15 days from date of such offer to accept or refuse such offer. Failure, neglect or refusal of the seller herein to either accept or refuse any such offer within said 15 day period shall be treated as a refusal and the buyer shall then be free to sell to any third party at a price equal to or in excess of the last price at which offered to the seller herein."

On May 12, 1960, a document entitled "SUPPLEMENTAL AND AMENDED SALE AND PURCHASE AGREEMENT" was executed by Whitlock, Hartnett and Jones with Whitlock designated as "Seller or First Party" and Jones and Hartnett designated as "Buyers or Second Parties." That document related to the same tract of land and spelled out an intention that it should be platted as an addition to the City of Casper, Natrona County, Wyoming, to be known as Alta Vista Addition. This instrument described the prior course of conduct among the parties, including the earlier contract and some verbal agreements, and noted that it was intended to consolidate and clarify all agreements among the parties relating to the sale, purchase and development of the lands to be included in said addition. That plat was accomplished, filed and approved in 1960. The instrument provided that:

" * * * the cost and expense of such platting, improving and developing to be shared and paid for as due, 60 per cent by the seller and 20 per cent each by the buyers, except for certain items of expense hereinafter mentioned and with reference to which a different ratio of sharing shall apply, and that the net profit from the sale of lands in said addition

* Retired March 26, but continued to participate in the decision of the court in this case pursuant to the order of the court entered March 30, 1981.

** Chief Justice at the time of oral argument.

should be shared and distributed 60 per cent to the seller and 20 per cent each to the buyers. * * * "

At yet another place the agreement provided:

"* * * The net profit received by the parties from the sale of unimproved or improved lands in said addition shall be shared and distributed 60 per cent to First Party and 40 per cent to Second Parties."

At various other places reference is made to the sharing of various expenses or the sharing of income on the same 60 percent for Whitlock, 20 percent for Hartnett, and 20 percent for Jones basis. The last clause of the May 12, 1960, contract is the one which has led to the major issue posited in this case. It reads as follows:

"If any party hereto desires to sell his separate interest in said land and addition, or any part thereof, he shall first offer to sell it to the other parties hereto and if they do not purchase it within thirty days of the date of offer at the seller's asking price, he may sell to any third party for such asking price or higher; however, if he reduces his asking price, then he must first offer it to the other parties hereto at the reduced price and they have thirty days from the date of the reduced offer to purchase; otherwise, seller may sell to any third party at the last reduced price.

"This agreement and all provisions hereof are for the mutual benefit of and binding upon the parties signatory, their respective heirs, personal representatives and assigns."

The subdivision was developed and sold beginning in 1960 up until about 1964. Then a slump in real estate activity in the Casper, Wyoming, vicinity occurred, and no lots were sold until the balance were disposed of by the parties after the institution of this action in 1976. On May 1, 1965, Oscar J. Whitlock and his wife, by warranty deed, conveyed to Mutual Construction Company, a Wyoming corporation, Whitlock's 60 percent interest in 49 of the lots which then remained unsold. This deed was recorded in the office of the county clerk on October 3, 1966. There appears to be no argument between the parties over the fact that the 49 lots potentially were the most valuable of the 145 lots remaining unsold because of the lay of the land in Alta Vista Addition and a draining problem affecting a large number of the remaining lots.

James C. Jones and his wife owned a 50 percent interest in Mutual Construction Company and they succeeded to the interest of Mutual Construction Company in these lots upon the liquidation of Mutual Construction Company in 1968. The district court found as one of its findings of fact:

"By a deed dated May 1, 1965, recorded October, 1966, Whitlock sold a portion of his interest to Mutual Construction Company, in which the Defendant Jones and his wife owned one half the stock. In 1968, Jones purchased the assets of Mutual Construction. Hartnett did not learn of these transfers until 1970, at which time he demanded a one-half share of Whitlock's former interest."

This action was commenced in late December of 1976 by Fred Hartnett seeking judgment against Jones and Whitlock in the amount of money representing "the difference in the value of the lands involved [the 49 lots] between the date of the transfer by Whitlock to Mutual Construction Company and the present time." Oscar Whitlock died after the commencement of this action, and the co-executors of his estate were substituted as parties.

The district judge entered judgment in favor of Jones and the executors of Oscar J. Whitlock's estate. His critical finding of fact is as follows:

"On May 12, 1960, the parties entered into an agreement concerning ownership and development of certain real property, the agreement being entered into evidence as plaintiff's Exhibit 2. Among other things, the agreement provided that if any party desires to sell his separate interests in the land, he shall first offer to sell it to the other parties. It was provided that all portions of the agreement are for the benefit of and

binding upon the parties and their heirs, representatives and assigns. The agreement further provided that the parties would share development costs on the basis of sixty percent to Whitlock and twenty percent each to Hartnett and Jones."

The dispositive conclusion of law on this issue reads as follows:

"The preemptive right section of the Contract, upon which this cause of action is based, is contrary to the rule against perpetuities, and therefore cannot serve as the basis for a recovery by the plaintiff, 40 ALR 3rd 920; § 34–1–139, W.S. (1977)."

Hartnett has appealed this judgment. In his brief he describes the issue to be resolved as follows:

"Whether a preemptive right to purchase contained in a contract concerning joint ownership of land, is in violation of the rule against perpetuities, and hence unenforceable, because the contract is not only binding upon the parties to it, but also upon 'their respective heirs, personal representatives and assigns.'"

The appellees have joined issue as to the claim of the appellant, but they also seek to defend the judgment entered by the district court on the grounds that Hartnett's claim is barred by laches; waiver and estoppel; and the ten-year statute of limitations. The appellees also assert that the appellant's claim is barred because the preemptive right violates the rule against restraints on alienation as well as the rule against perpetuities.

Wyoming has by statute adopted the common-law rule against perpetuities. Chapter 92, § 1, S.L. of Wyoming 1949. It now is found in § 34–1–139, W.S.1977, which reads as follows:

"No interest in real or personal property shall be good unless it must vest not later than twenty-one (21) years after some life in being at the creation of the interest and any period of gestation involved in the situation to which the limitation applies. The lives selected to govern the time of vesting must not be so numerous nor so situated that evidence of their deaths is likely to be unreasonably difficult to obtain. It is intended by the enactment of this statute to make effective in this state the American common-law rule against perpetuities."

The district court well may have been correct in its interpretation of Annotation, Preemptive Rights as Violation of Rule Against Perpetuities or Rule Concerning Restraints on Alienation, 40 A.L.R.3d 920 (1971). The matter may have been more aptly stated, however, by the Supreme Court of Colorado in *Atchison v. City of Englewood*, 170 Colo. 295, 463 P.2d 297, 298, 40 A.L.R.3d 904 (1969), where the following language appears:

"(2), even if the pre-emptive right was not personal and would extend more than 21 years beyond the life of a person in being, should it be proscribed by the rule against perpetuities? * * * as to the second question, the scales of decision are so evenly balanced that a little weight on either side would weigh it down."

While the courts have manifested a predilection to invoke the rule against perpetuities with respect to a preemptive right such as that reflected in this contract, we believe that the situation needs to be carefully analyzed so that the reach of the rule against perpetuities is not unduly extended beyond the mischief that the rule was designed to prevent. Although the Colorado court, in *Atchison v. City of Englewood*, supra, did apply the rule against perpetuities to a preemptive right, the Colorado Court of Appeals, in a later case, adopted the approach taken by the Fifth Circuit Court of Appeals in *Weber v. Texas Co.*, 83 F.2d 807 (5th Cir. 1936), cert. denied, 299 U.S. 561, 57 S.Ct. 23, 81 L.Ed. 413 (1936), and did not apply the rule against perpetuities with respect to a preemptive right in a different factual situation from that found in *Atchison v. City of Englewood*, supra. *Oliner v. City of Englewood*, 42 Colo.App. 106, 593 P.2d 977 (1979). The Supreme Court of Washington also recently has adopted this position in *Robroy Land Company v. Prather*, Wash., 622 P.2d 367 (1980).

In *Weber v. Texas Co.*, supra, the pre-emptive right applied to the reserved one-eighth royalty interest of a lessor in an oil and gas lease. The lessee had the option of purchasing all or any part of the reserved royalty interest for an amount equal to the best bona fide offer of a third party. The right did extend to the "heirs, personal representatives, successors and assigns of the lessee," and it was to remain in force "as long as either oil or gas is or can be produced from any well on said land." The Fifth Circuit Court of Appeals in dealing with the application of the rule against perpetuities in that factual situation said:

"The rule against perpetuities springs from considerations of public policy. The underlying reason for and purpose of the rule is to avoid fettering real property with future interests dependent upon contingencies unduly remote which isolate the property and exclude it from commerce and development for long periods of time, thus working an indirect restraint upon alienation, which is regarded at common law as a public evil. [Citations.]

"The option under consideration is within neither the purpose of nor the reason for the rule. This is not an exclusive option to the lessee to buy at a fixed price which may be exercised at some remote time beyond the limit of the rule against perpetuities, meanwhile forestalling alienation. The option simply gives the lessee the prior right to take the lessor's royalty interest at the same price the lessor could secure from another purchaser whenever the lessor desires to sell. It amounts to no more than a continuing and preferred right to buy at the market price whenever the lessor desires to sell. This does not restrain free alienation by the lessor. He may sell at any time, but must afford the lessee the prior right to buy. The lessee cannot prevent a sale. His sole right is to accept or reject as a preferred purchaser when the lessor is ready to sell. The option is therefore not objectionable as a perpetuity." *Weber v. Texas Co.*, supra, 83 F.2d at 808.

In an experience somewhat similar to that in Colorado, the Oklahoma Supreme Court initially rejected outright the reasoning of *Weber v. Texas Co.*, supra. *Melcher v. Camp*, Okl., 435 P.2d 107 (1967). The Oklahoma court there pursued a rather rigid application of the rule against perpetuities, and concluded that it did apply because "the optionees' right to the interest in the property * * * could vest beyond the period permissible under the rule against perpetuities. A provision creating such rights, being violative of the rule against perpetuities, is void." *Melcher v. Camp*, supra, at 155. In *Producers Oil Company v. Gore*, Okl., 610 P.2d 772 (1980), however, the Oklahoma Supreme Court, responding to a certification of questions for the United States Court of Appeals for the Tenth Circuit, answered in the negative the following certified question:

"(1) Does the Oklahoma Rule Against Perpetuities apply to the interest created by the preemptive option provisions of the oil and gas lease operating agreements described below?" *Producers Oil Company v. Gore*, supra, at 773.

The Oklahoma Supreme Court there agreed with the position of the United States District Court, which in first deciding the case, *Producers Oil Company v. Gore*, 437 F.Supp. 737 (E.D.Okl.1977), had applied the rule against perpetuities, but had criticized application of the rule to oil and gas operating agreements. The United States District Court there said, 437 F.Supp. at 742:

"The court is of the strong view that the rule against perpetuities should not apply to oil and gas operating agreements. From its inception in 1682, this court-made rule of law, the genius of English judges, was designed to further alienability and to prevent the tying up of property within the family line for generation on generation. It could not have intended to apply, it should not apply and no worthwhile social or economic purpose is served by applying it to this common, frequent and useful type of oil and gas transaction. The provision in question does not clog alienation. * * * "

The Oklahoma court then distinguished the earlier case of *Melcher v. Camp*, supra, on a factual basis, and held that when the pre-

emptive right is limited to the duration of the lease the rule against perpetuities does not apply. It does seem, to paraphrase the United States District Court for the Eastern District of Oklahoma, that it might well be said that the rule against perpetuities could not have been intended to apply, and no worthwhile social or economic purpose is served by applying it, to a common provision in commercial ventures designed to protect the rights of the parties in the venture.

■ Other courts have found various ways to avoid the application of the rule against perpetuities to preemptive rights. Some have held that an option[1] creates no interest in the land. E. g., *Keogh v. Peck*, 316 Ill. 318, 147 N.E. 266, 38 A.L.R. 1151 (1925). See generally, *Gautier v. Lapof*, Fla., 91 So.2d 324 (1956). Other courts have concluded that an option creates a vested interest in the property, and that since the interest is presently vested there is no reason to invoke the rule against perpetuities, which assumes a future vesting. E. g., *Greenshields v. Warren Petroleum Corporation*, 248 F.2d 61 (1957), cert. denied, 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262 (1957). See generally, *Wall v. Minneapolis St. P. & S. S. M. Ry. Co.*, 86 Wis. 48, 56 N.W. 367 (1893). Still other courts have concluded that an option is a personal right and not an interest in property. For that reason it is not inhibited by a rule relating only to real property. *Dodd v. Rotterman*, 330 Ill. 362, 161 N.E. 756 (1928); *Weitzmann v. Weitzmann*, 87 Ind.App. 236, 161 N.E. 385 (1928). See *Mercer v. Lemmens*, 230 Cal.App.2d 167, 40 Cal.Rptr. 803 (1964); *Frissell v. Nichols*, 94 Fla. 403, 114 So. 431 (1927). In still other jurisdictions the ratio decidendi has been that the option or preemptive right simply is an exception to the rule of perpetuities because it creates an estate on a condition subsequent to which the rule does not apply. *Dozier v. Troy Drive-In-*

*Theaters*, 265 Ala. 93, 89 So.2d 537 (1956); *Hollander v. Central Metal & Supply Co. of Baltimore City*, 109 Md. 131, 71 A. 442 (1908).

■ We note in this case that the facts lead to the conclusion that the appellant and the appellees were involved in a joint venture. While we have previously said that the existence of a joint venture usually is a question of fact (*Madrid v. Norton*, Wyo., 596 P.2d 1108 (1979); *P & M Cattle Company v. Holler*, Wyo., 559 P.2d 1019 (1977); *Robinson Transportation Company v. Hawkeye-Security Insurance .Company*, Wyo., 385 P.2d 203 (1963)), it does not appear that any of these parties would dispute the nature of their arrangement. For example, income from this project was reported on federal partnership income tax returns. In *P & M Cattle Company v. Holler*, supra, we said that a joint venture usually relates to a single transaction, though it may be continued over many years. It is a special combination of two or more persons wherein some specific venture for profit is jointly sought without any actual partnership or corporate designation. It has been the uniform holding of this court that a joint venture is to be governed by the law of partnership. *Madrid v. Norton*, supra; *True v. Hi-Plains Elevator Machinery, Inc.*, Wyo., 577 P.2d 991 (1978); *P & M Cattle Company v. Holler*, supra. By statute in Wyoming, and this is a rather general rule with respect to partnerships,

"(a) Dissolution is caused:

\*   \*   \*   \*   \*   \*

"(iv) By the death of any partner." Section 17–13–603, W.S.1977.

■ Analyzing the facts of this case in the context of the criteria suggested by *Weber v. Texas Co.*, supra, we see little danger that this property could be excluded

---

1. We note that a preemptive right is different from the ordinary option. In an option situation the optionee has the right to purchase something for a definite consideration. A preemptive right gives a privilege to purchase on a condition precedent which is the formulated desire of the owner to sell, and frequently the holder of the right must purchase at a price

established by negotiations with a third party. *Mercer v. Lemmens*, 230 Cal.App.2d 167, 40 Cal.Rptr. 803 (1964); *Atchison v. City of Englewood*, 170 Colo. 295, 463 P.2d 297, 298, 40 A.L.R.3d 904 (1969); Annotation, Pre-emptive Rights to Realty as Violation of Rule Against Perpetuities or Rule Concerning Restraints on Alienation, 40 A.L.R.3d 920, 924–926 (1971).

from commerce and development for any periods of time beyond the lives of the parties to the joint adventure plus 21 years. Because of the statutory dissolution upon death, this preemptive right would have to be exercised within the period established in § 34–1–139, W.S.1977. It is not an exclusive option to buy at a fixed price. It does not inhibit alienation by the other party, but simply provides that there is a preferred right to buy at the market price if the other party desires to sell. The holder of the preemptive right cannot prevent the sale, and he must act promptly if the other party desires to sell. We also note that there is no problem with respect to ascertaining and locating the owners of the preemptive right so as to make that an unreasonable task, a factor relied upon by the Supreme Court of Colorado in *Atchison v. City of Englewood*, supra.

It then is our conclusion that this right would have to be exercised, if at all, within the lifetime of the first co-adventurer to die or within 21 years thereafter. If one of the co-adventurers died, under Wyoming law his interest would vest in his heirs, and that would be a transfer which would trigger the preemptive right on the part of the survivors. They would perforce have to act promptly to assert their claim based upon the preemptive right in the estate of the deceased joint adventurer. As to any other potential transfer, the dissolution of the joint adventure upon the death of one of the joint adventurers would terminate the rights under the contract, including the preemptive right, except insofar as they could be exercised as a process of liquidating the partnership property. Because of the nature of the ownership in this instance, however, it would not be necessary to sell this part of the partnership property for purposes of a liquidation. The preemptive right then not only does not come within the policy which § 34–1–139, W.S.1977, was designed to uphold, but the contract does not contravene the statutory language.

■ Mindful of the claim of the appellees that the preemptive right still may be an unreasonable restraint upon alienation, much of what we have said above applies to that theory. While it is not necessary to so hold in this case, given the various grounds by other courts for not applying the rules against perpetuities to preemptive rights, it is far better to treat with them against the rule prohibiting unreasonable restraints on alienation. In *Missouri State Highway Commission v. Stone*, Mo.App., 311 S.W.2d 588 (1958), the court noted that whether a particular preemption agreement constituted an unreasonable restraint on alienation would depend on the particular circumstances of the case. It suggested among the factors to be considered are (1) the purpose for which the restraint is imposed; (2) the duration of the restraint; and (3) the method of determining the price. Here the sole purpose seems to have been to protect the rights of the parties to the potential profits from their investment, and not to keep the property off the market. As we have noted, despite the language of this agreement purportedly extending the benefits of the contract to the heirs, representatives and assigns of the parties, the right would be exercised, if at all, within the 21-year period after the death of any co-adventurer. Such a period of time does not, under these circumstances, stand as unreasonable. With respect to the method of determining the price, that would have been set by the seller, and therefore the holder of the preemptive right could not have an opportunity to inhibit marketability. The situation in that regard is entirely different from one in which a fixed option is provided. We do note that possession of the right by any assigns of any of the parties would require a novation of the agreement because in order for a third party to become an assignee the other parties must have failed to exercise their preemptive rights. The assignee then would either have to be accepted as a member of the co-adventure, or there would be no continuity of the preemptive right. We therefore hold that this arrangement did not violate the rule against unreasonable restraints on alienation any more than it violated the rule against perpetuities.

■ Having concluded that recovery by the appellant in this instance would not be barred because the contractual provision violated the statutory rule against perpetuiti-

es, and would not be barred because the provision constituted an unreasonable restraint upon alienation, we then must look to determine whether there is any other basis for affirmance of the trial court's judgment. The trial court found that the appellant did not learn of the transfers from Whitlock to Mutual Construction Company and Mutual Construction Company to Jones until 1970, and consequently the action is not barred by the applicable statute of limitations since Wyoming generally applies a discovery rule in order to initiate the period of limitations. *Duke v. Housen*, Wyo., 589 P.2d 334 (1979), reh. denied, 590 P.2d 1340, cert. denied, 444 U.S. 863, 100 S.Ct. 132, 62 L.Ed.2d 86 (1979). We have said, however:

"* * * There is an inherent injustice in one purportedly holding a right to assert an ownership in property to voluntarily await the propitious event and then decide, when the danger which has been at the risk of another is over, to come in and claim a share of the profits. * * *" *Madrid v. Norton*, supra, at 1120.

To invoke the doctrine of laches, though, delay in asserting a right is not sufficient in itself. On this score our rule is that:

"* * * Other facts and circumstances must be shown before the rule can operate as an estoppel. Unless the delay has worked injury, prejudice or disadvantage to the defendants or others adversely interested, it is not of itself laches. * * *" *Beadle v. Daniels*, Wyo., 362 P.2d 128, 131 (1961), and authorities cited therein.

We note that during the period prior to this action the value of the property increased dramatically. A co-tenant who desires to share in the benefit of an interest acquired by another co-tenant must within a reasonable time offer to contribute his share of the cost thereof. If he unreasonably delays his election until a change in the condition of the property or the circumstances of the parties occurs, he will be held to have abandoned all right to benefit from any claim arising from the acquisition. *Binning v. Miller*, 55 Wyo. 478, 102 P.2d 64 (1940), reh. denied, 56 Wyo. 129, 105 P.2d 278 (1940). In deciding the issues presented to it the district court also ruled against the

appellees on a counterclaim for development costs. The ground stated by the district judge in his findings of fact was:

"The amount due and owing from the plaintiff to Defendant Jones accrued more than ten years prior to the assertion of the claim in this action."

Jones testified with respect to that amount that demand had been made upon Hartnett, but according to Jones' testimony Hartnett refused to pay on the ground that Jones was going to buy his interest in the lots in any event. Hartnett and his wife testified that Hartnett had made all the contributions that the arrangement required of him. The conclusion to be drawn with respect to the doctrine of laches is that Jones was prejudiced with respect to the collection of that claim by virtue of the delay in pursuing the preemptive right on the part of Hartnett, which was not consistent with Hartnett's claim to a right to purchase under the preemptive right.

Perhaps of even greater import is the fact that Jones and Whitlock had obtained an offer from a third party to purchase the property in April of 1976. They were agreeable to the terms and conditions of that offer and were prepared to go forward with a sale. At that time Hartnett refused to agree to the sale because Jones would not acknowledge his claim to a share of the selling price representing the appreciation in value of Whitlock's interest in the 49 lots which had earlier been sold to Mutual Construction Company. In this manner also the delay worked injury, prejudice and disadvantage to Jones.

We therefore conclude that despite the erroneous basis for the decision which the trial court adopted, the appellant was guilty of laches in failing to bring this action sooner than he did, and that defense having been claimed by the appellees, the judgment of the district court should be affirmed on that ground.

Affirmed.

ROONEY, Justice, concurring in part and dissenting in part.

I agree with the result reached by the majority opinion with reference to the inap-

plicability of the rule against perpetuities, but I would rest the finding upon the proposition that the option creates a vested interest in the property, thus precluding the use of the rule against perpetuities, which assumes a future vesting. See cases cited in majority opinion with reference thereto.

I cannot agree that this court can make a factual finding of laches in this case, and I would remand the case for findings by the trial court with reference to the defenses other than that based on the rules against perpetuities.

As pointed out in the majority opinion, the trial court found that appellant did not learn of the transfers from Whitlock to Mutual Construction Company and from Mutual Construction Company to Jones until 1970.[1] The trial court also found that *when appellant learned of these transactions,* he "demanded a one-half share of Whitlock's former interest." Following is the testimony of appellant with reference to the discussion between appellant and appellee Jones *at the time appellant learned of the transactions* in 1970:

"Well, I told him that, when he told me he had bought these lots, I said, Jim, that isn't right, and he said, What do you mean? I said, well, we have a contract whereby either you or Oscar or myself have to offer to the others and have equal chance to purchase them. He said, Well, Oscar, or Mr. Whitlock owed him some money for sales commission on land he had previously sold for him, houses he had previously sold, and he said he paid $9,600. for these lots. And I said, well, I feel that I should have an opportunity to buy half of the interest that you bought from him, and he said, well, if I wanted to then, he said, I was going to have to pay all the interest during the time that he had had these lots, and he compiled the interest on this over a period of four year's time, come up with a total figure and divided by two and said I would have to pay that. I said, Well, Jim, that isn't fair that I should have to pay interest on that. I said, you should have come to me

and told me, I should have been able to buy it at the time that you did, and I said, I want to buy into them, entitled to a half interest, and he said, all right, then I would have to pay this, *but we saw each other many times after that for the following two years, Jim would come to the house, but I could never get him to bring me a deed. I kept pressing him, telling him I would like to get that settled."* (Emphasis added.)

In early 1976, a sale to a man named Ferguson failed because appellant would not agree to it unless he received a share which would reflect half ownership in the interest previously owned by Whitlock less half the amount paid by appellee Jones for such share. Later that year, negotiations were had between appellant and appellee Jones for the purchase of each other's interest in an effort to settle the issue. They finally sold the property to Pulte Homes with $40,000 of the consideration being placed in escrow subject to a determination of the validity of appellant's claim.

The testimony reflects that appellant and appellee Jones were not only business associates but were close friends. Under the circumstances of this case, I do not believe laches can be attributed to appellant *as a matter of law.* Appellant asserted his position immediately upon learning of the prior transfers. The position was a factor in connection with subsequent potential sales of the property and in the final sale of it. Although appellant did not institute a legal action premised on his position, he was not completely "sleeping on his rights" but was actively contending for them in other fashions. At least there exists a factual question concerning the matter.

" ' * * * The length of time during which the party neglects the assertion of his rights which must pass in order to show laches varies with the peculiar circumstances of each case, and is not, like the matter of limitations, subject to an arbitrary rule. It is an equitable defense, controlled by equitable considerations,

---

1. The majority opinion noted that such precluded a bar to the action by the statute of limita-

tions. The statute of limitations was one of the affirmative defenses to the action.

and the lapse of time must be so great, and the relations of the defendant to the rights such, that it would be inequitable to permit the plaintiff to now assert them.'" *Anderson v. Wyoming Development Co.*, 60 Wyo. 417, 154 P.2d 318, 346 (1944).

The majority opinion correctly notes that prejudice or disadvantage to those adversely interested is an element of the doctrine of laches. The determination of prejudice in this instance is one of fact.

The majority opinion refers to a denial by the trial court of appellee Jones' counterclaim against appellant for $1,792, said to be appellant's share of the cost of a sewer line on 21st Street in 1964. The counterclaim was denied because the statute of limitations operated to bar it. The majority opinion somehow attributes prejudice to appellees because appellant did not bring his action in time for appellees to assert their counterclaim before the bar. Appellees could have pressed their claim without waiting for appellant to act first. Which party, if any, was prejudiced by failure of the other party to first institute an action is a question of fact.

The majority opinion points to a specific conflict in testimony of appellant and appellee Jones with reference to whether or not appellant had made this $1,792 contribution. The conflict should be resolved by the trial court. It is not the function of an appellate court to evaluate evidence, *Ford Motor Company v. Arguello*, Wyo., 382 P.2d 886 (1963), or to consider and weigh conflicts in it, *LeBar v. Haynie*, Wyo., 552 P.2d 1107 (1976).

I do not believe the facts of this case relative to laches are conclusively established, sufficiently clear, or of a nature from which different inferences can not reasonably be drawn. See e. g. Annotation: Constructive Eviction, 91 A.L.R.2d 638, 645, § 5[b]; Annotation: Liability Insurance—Notice—Papers, 18 A.L.R.2d 443, 504, § 40. Accordingly, I would reverse and remand for consideration [2] and determination by the

trial court of the affirmative defenses other than that grounded on the rule against perpetuities.

---

**2.** The trial court refused to enlarge and generalize the language of the judgment to include grounds for it in addition to a violation of the

rule against perpetuities as requested by appellees.